UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA,

v.                                          Case No. 2:18 CR 89-FTM 99CM

WILLIAM NOBLES

_____/

## MOTION TO SUPPRESS EVIDENCE

The defendant, William Nobles, through counsel, moves this Court, pursuant to Fed. R. Crim. P. 12 (b)(3)(c), to suppress evidence, and states:

### I. EVIDENCE SUBJECT TO SUPPRESSION

On the grounds stated herein, Mr. Nobles maintains that all evidence derived from the following should be suppressed: (A) The government's illegal search of Mr. Nobles' computer through the deployment of a "Network Investigative Technique;" (B) the government's illegal search of Mr. Nobles' residence; and (C) the government's illegal questioning of Mr. Nobles after the execution of the local warrant, in violation of *Miranda vs. Arizona*, 384 U.S. 436 (1966). This includes all evidence, including computers, computer discs, thumb-drives, digital images seized and statements obtained from Mr. Nobles pursuant to the search warrant executed at his residence on August 5, 2015.

### II. STATEMENT OF FACTS

On August 5, 2015, the Federal Bureau of Investigation (FBI) executed a search warrant at Mr. Nobles' home located at 745B F. Road, Labelle, Florida. The

1

warrant in question was issued on July 30, 2015 by United States Magistrate Judge Mac R. McCoy. Exh. A. ("The Labelle Warrant"). The warrant application was based upon the affidavit of Lee County Sheriff's Deputy Jody Payne, a member of "the FBI Child Exploitation Task Force." Exh. B.

The affidavit in support of the Labelle Warrant was based upon information derived from an investigation into a Website referred to in the government's affidavit as "Website A," and particularly the information acquired from a search warrant for "Website A" issued in the Eastern District of Virginia on February 20, 2015 by a United States Magistrate Judge. Exh. C ("The NIT warrant")."[1] The affidavit in support of the Labelle warrant described Website A as "a child pornography bulletin board and website dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children online." Exh B ¶ 11. Government investigators seized the computer server hosting Website A in North Carolina on February 20, 2015, and brought it to Virginia. *Id.* The FBI assumed control over the website and continued to operate it from a government facility in Virginia. *Id.* The website was in operation, run by the government, until March 4, 2015. *Id.*

The affidavit for the Labelle Warrant continued that investigators discovered that the website encouraged users to register using an email address that looks to be valid, but not to provide any information that could be used for identification. *Id.* at

---

[1] "Website A" was actually known to be "Playpen." However to avoid compromising the then-ongoing investigation, the warrants in question simply referred to the site as "Website A" or "Target Website."

¶ 14. After registering, users could then access different sections of the website, including forums and sub-forums relating to sexual exploitation of children. *Id.* at ¶ 16. According to the affidavit, a majority of these forums contained images of child pornography and child erotica. *Id.* at ¶ 19.

The affidavit further alleged that Website A utilized network software that concealed users' true Internet Protocol address ("IP address"). *Id.* at ¶ 7-8. Specifically, the website operated on an anonymous network known as "The Onion Router" or "TOR" which prevented law enforcement from obtaining the user's IP address without the use of a "Network Investigative Technique." ("NIT"). Because Website A utilized the TOR network, logs of member activity contained on the seized server could not be used to locate and identify users. *Id* at ¶ 9-10.

The NIT was designed to cause a user's computer to transmit certain information to a computer controlled by the government. Exhibit C at ¶ 33. This data included a broad range of information about the user's computer, but particularly the IP address. *Id.* at ¶ 34.

On February 28, 2015, during the time the government operated Website A, a user identified as "FizzWink222," accessed the website. Using the NIT, the government was successful in capturing the IP address used by "FizzWink222" on this occasion.  "FizzWink 222" also accessed the website on March 1 and March 5, 2015. However, the government did not capture the IP address used on either occasion. Thus, it is not known whether this user(s) accessed the website from the same IP address as was used on February 28.

3

The government's application did not allege that it was able to determine what was accessed at the time the IP address was captured. There was no allegation that the links to child pornography materials mentioned in the affidavit, were ever utilized.

The IP addressed captured on February 28, 2015 was traced to an account with Century Link to the residence where Mr. Nobles resides with his parents. The account-holder was Mr. Nobles' father. The search warrant executed at that residence resulted in the seizure of a computers, computer discs, thumb drives, as well as other materials. It is alleged that these items contained child pornography as well as other materials which the government would offer against Mr. Nobles at trial.

## III. GROUNDS FOR SUPPRESSION

### A. THE INVALIDITY OF VIRGINIA WARRANT (THE NIT WARRANT) REQUIRES SUPPRESSION

1. The use of the NIT to access information from Mr. Nobles' computer constituted a search for purposes of the Fourth Amendment.

As a threshold matter, accessing Mr. Nobles computer using the NIT, so as to cause it to reveal the IP address, is a search for purposes of the Fourth Amendment. *See United States v. Horton*, 863 F.3d 1041, 1047 (8th Cir. 2017)(concluding that the execution of the NIT requires a warrant).

In *United States v. Darby*, 190 F. Supp. 3d 520, 528-529 (E.D. Va. 2016), aff'd 721 F. App'x 304 (4th Cir. 2018), the Eastern District of Virginia discussed how the NIT operates and concluded that its operation was clearly a search. Relying in part on *Riley v. California,* 134 S. Ct. 2473, 2480 (2014), the court recognized

4

> If an individual has a reasonable expectation of privacy in the contents of his or her personal computer, as he or she does, and the deployment of the NIT invades that privacy, then the NIT is a search. The NIT in this case caused Defendant's computer to download certain code without the authorization or knowledge of Defendant. The "contents" of a computer are nothing but its code. In placing code on Defendant's computer, the government literally—one writes code—invaded the contents of the computer

*Id.* at 530. Therefore, the reasonableness clause of the Fourth Amendment requires that law enforcement obtain a *valid* judicial warrant before conducting a search. For the reasons stated below, Mr. Nobles maintains that the Eastern District of Virginia warrant was invalid.

> 2. Deploying the NIT to Mr. Nobles' computer in the Middle District of Florida exceeded the scope of the warrant issued in the Eastern District of Virginia.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." If the execution of a search or seizure exceeds the scope of a warrant, the subsequent search or seizure is unconstitutional. *Horton v. California*, 496 U.S. 128, 140 (1990). Whether a search or seizure exceeds the scope of a warrant is an issue that is determined "through an objective assessment of the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search." *United States v. Hurd*, 499 F.3d 963, 966 (9th Cir 2007) (internal quotations and citations omitted). The NIT warrant did not purport to authorize a search beyond the Eastern District of Virginia. The use of this search warrant to access, and therefore search,

Mr. Nobles' computer in Hendry County, Florida exceeded the scope of the warrant, and, therefore, violated the Fourth Amendment.

3. <u>The NIT Warrant lacks specificity and amounts to a general warrant.</u>

If the NIT Warrant was not intended to limit its deployment to computers within the Eastern District of Virginia, it is nonetheless unconstitutional because it lacks specificity and amounts to a general warrant. Mr. Nobles maintains that the Government failed to comply with the Fourth Amendment's particularity requirements by failing to set out that the place to be searched was a computer in Florida.

The "manifest purpose of the particularity requirement of the Fourth Amendment is to prevent wide-ranging general searches by the police." *United States v. Bonner*, 808 F.2d at 866 (1st Cir. 1986). "Particularity means the 'warrant must make clear...exactly what it is that he or she is authorized to search for and seize. *United States v. SDI Future Health*, Inc., 568 F.3d 684, 702 (9thCir. 2009) (quoting *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991)).

The test for determining the adequacy of the description of the location to be searched is whether 'there is any reasonable probability that another premise might be mistakenly searched.'" *Bonner*, 808 F.2d at 866. Because the magistrate in Virginia could not authorize a search of a computer in Florida, its occurrence demonstrates that the description was insufficient to prevent a reasonable probability of mistake. The fact that countless other computers were also searched only bolsters this conclusion. When it comes to a constitutional concern such as the

particularity requirement, the government cannot be rewarded for vagueness. To do so would invite further violations and undermine the core requirement set forth in the Fourth Amendment. *See In re Warrant*, 958 F. Supp. 2d 753, 758 (SD Tex. 2013). ("This particularity requirement arose out of the Founders' experience with abusive general warrants").

4. <u>The NIT Warrant Violated Ru1e 41 of the Federal Rules of Criminal Procedure and 28 U.S.C. § 636.</u>

A magistrate judge's jurisdiction and authority is "limited to those matters authorized by Congress." *United States v. Colacurcio*, 84 F.3d 326, 328 (9th Cir. 1996). Under the Magistrates Act, 28 U.S.C. § 636, Congress has authorized magistrate judges "within the district in which sessions are held by the court that appointed the magistrate judge" to exercise all the power authorized by the Federal Rules of Criminal Procedure. 28 U.S.C. § 636(a)(1). Federal Rule of Criminal Procedure 41(b), in turn, authorizes a "magistrate judge" to issue search warrants. Fed. R. Crim. P. 41(b) (2015). Thus, a magistrate judge's authority to issue a search warrant comes from Federal Rule of Criminal Procedure 41 and no other source.

At the time the NIT warrant was issued in 2015, Rule 41 authorized magistrate judges to issue search warrants only within their judicial district. Specifically, a magistrate judge could issue a warrant: when the person or property to be searched or seized is "located within the district"; "when the person or property to be searched or seized is outside the district if the person or property is within the district when the warrant is issued, but may move outside the district before the warrant is executed"; when the person or property to be searched or seized is

connected to a terrorism investigation where activities occurred within the district, regardless of whether the person or property is within the district or not"; "to install a tracking device within the district to track the movement of a person or property regardless of whether they are in the district or not;" and "on some federal property or diplomatic or consular missions, regardless of where it is located, when criminal activity occurred within the district of the issuing magistrate judge." Fed. R. Crim. P. 41(b) (2015).

The search of Mr. Nobles home and computer devices on August 5, 2015 was the direct result of the illegal search of his computer-and countless others through the use of a NIT. Rule 41 simply does not permit a magistrate judge in Virginia to authorize the search of the defendant's computer located in Florida.

In *United States v. Werdene*, 883 F.3d 204, 207 (3d Cir. 2018), the court concluded that the NIT warrant did in fact violate the Rule 41(b), as it read at the time, and that "the magistrate judge exceeded her authority under the Federal Magistrates Act." Therefore, "[t]he warrant was therefore void *ab initio*, and the Rule 41(b) infraction rose to the level of a Fourth Amendment violation." *Id.* (citing *United States v. Master,* 614 F.3d 236, 239 (6th Cir. 2010) ("[W]hen a warrant is signed by someone who lacks the legal authority necessary to issue search warrants, the warrant is void *ab initio*."). Similarly, the Eighth Circuit in *Horton* 863 F.3d at 1047-1048, 1049 concluded that the NIT warrant "exceeded the magistrate judge's jurisdiction," and thus also concluded that the warrant was "void *ab initio.*"

Certain district courts have traveled under Rule 41(b)(4) to support the issuance of the NIT. This, however, requires a court to re-label the warrant as a "tracking device."[2] Under Rule 41(b)(4) a magistrate may authorize a tracking device to be installed within the issuing district on an object that may travel to outside the district.

In *Werdene*, the court specifically rejected the government's contention that the NIT was a tracking device. *See* 883 F.3d at 211-212. The court observed that "[a]s an initial matter it is clear that the FBI did not believe that the NIT was a tracking device when it sought the warrant." *Id.* at 211.  The court noted that a tracking warrant under Rule 41(b)(4) is a specialized document labeled as "Application for Tracking Warrant," as opposed to the standard search warrant application and warrant submitted in support of the NIT warrant. *See id.* "More importantly" the court concluded "the analogy (to a tracking device) does not withstand scrutiny." "The explicit purpose of the warrant was not to track movement—as would be required under Rule 41(b)(4)—but to obtain[ ] information from activating computers." *Id.* "[T]he NIT was designed to search-not track- the user's computer for the IP address and other identifying information, and to transmit the data back to a government-controlled server." *Id.* at 211-212. The court concluded that the fact that "the NIT did not track movement- is dispositive, because Rule 41(b)(4) is "based on the

---

[2] *See e.g., United States v. Austin*, No. 3:16-cr-00068, — F. Supp. 3d — 2017 WL 496374 (M.D. Tenn. Feb. 2, 2017); *United States v. Sullivan*, No. 1:16-cr-270, 2017 WL 201332 (N.D. Ohio Jan. 18, 2017); *United States v. Bee*, No. 16-002, 2017 WL 424905 (W.D. Mo. Jan. 13, 2017), report and recommendation adopted, No. 16-00002-01-CR-W-GAF, 2017 WL 424889 (W.D. Mo. Jan. 31, 2017).

understanding that the device will assist officers only in tracking the movements of a person or object." *Id.* (quoting Rule 41). "Furthermore, Rule 41(b)(4) requires that a tracker be "install[ed] within the district." Fed. R. Crim. P. 41(b)(4). It is difficult to imagine a scenario where the NIT was "installed" on Werdene's computer—which was physically located in Pennsylvania—in [the Eastern District of Virginia]." *Id.* at 212.

*Horton* likewise rejected the tracking device exception under (b)(4), noting that the NIT was actually installed on the defendants' computers in Iowa as opposed to the government's contention that they were actually installed during the defendant's "virtual trip" to the Eastern District of Virginia. *See* 863 F.3d at 1047-1048.[3]

As there is no provision under Rule 41 which authorizes the NIT warrant, any search pursuant thereto violates both that Rule as well as 28 U.S.C. § 636(a).

5. <u>The invalidity of the Virginia warrant requires suppression.</u>

The clearly-established jurisdictional requirement for searches under Fed. R. Crim. P. 41 and 28 U.S.C. § 636(a) are not merely ministerial technicalities. Rather, these provisions serve as a critical line of protection against the nationwide searches that occurred in this case. Suppression of the seized evidence is mandated because a search warrant that the magistrate judge was not permitted by rule and statute to issue is "no warrant at all," *United States v. Krueger*, 809 F.3d 1109, 1126 (10th Cir.

---

[3] Without the benefit of the subsequent appellate decisions rejecting the "tracking device" argument, a Report and Recommendation in this division concluded that the NIT is "*more akin* to a 'tracking device' as contemplated by Rule 41(b)(4)." *United States v. Hart,* Case 2:16-cr-00110-JES-CM, Report and Recommendation (Doc. 49)(April 25, 2017)(emphasis added).

2015) (Gorsuch, J., concurring), and is "per se harmful," i.e., prejudicial, to the defendant. *See id.* at 1122. It follows that the Rule 41(b) violation was of constitutional magnitude because "at the time of the framing ... a warrant issued for a search or seizure beyond the territorial jurisdiction of a magistrate's powers under positive law was treated as no warrant at all." *Krueger,* 809 F.3d at 1123 (Gorsuch, J., concurring*).* The unrestrained expansion of judicial authority to issue search warrants without geographic limitation is not a mere technicality. This violation of a jurisdictional statute mandates suppression to preserve judicial integrity and proper separation of powers under the United States Constitution.

Moreover, violations of Rule 41 require suppression when a defendant is prejudiced by the lack of compliance. *See Bonner*, 808 F.2d at 869. "Prejudice means being 'subjected to a search that might not have occurred or would not have been so abrasive' had the rules been followed." *United States v. Burgos-Montes,* 786 F.3d 92, 109 (1st Cir. 2015), quoting *Bonner*, 808 F.2d at 869. In this case, Mr. Nobles was prejudiced because the search authorized by the Labelle Warrant would never have occurred but for information derived from the improperly issued NIT Warrant. Investigators used this information to obtain the subscriber information for the IP address from Century Link, which ultimately led them to obtain the Labelle Warrant.

As argued above, Mr. Nobles maintains that the Government failed to comply with the Fourth Amendment's particularity requirements by failing to set out that the place to be searched was a computer in Florida. Had the government particularly

set out that the place to be searched was a computer in Florida, no warrant could have issued.

While the appellate cases finding a Rule 41 violation have nonetheless rejected suppression as the remedy under the "good faith exception" the Supreme Court has yet to address the issue. *See Werdene*, 883 F.3d at 216-219, *Horton*, 863 F.3d at 1052, *United States v. McLamb*, 880 F.3d 685, 689 (4th Cir. 2018).

For the reasons stated below, Mr. Nobles maintains that the good faith *exception* does not apply here. The source of the "good-faith" exception is, of course, *United States v. Leon,* 468 U.S. 897 (1984). In *Leon*, the Supreme Court concluded that the Fourth Amendment exclusionary rule does no bar the use of evidence obtained by officers acting in reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. *See id.* at 900. There was no suggestion in *Leon* that the state court judge who had issued the warrant lacked jurisdictional authority to do so. Nor has there been any suggestion in the Supreme Court cases following *Leon*, that good-faith can apply where the Court did not have the authority to issue the search warrant in the first place.

Even if "good-faith"can apply to a search warrant where the issuing magistrate had no authority to issue the warrant, it does not apply where: (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial

role . . . ; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. *Leon*, 468 U.S. at 923.

The plain language of Rule 41(b) simply does not permit a magistrate judge to allow the search of potentially thousands of computers located outside the authorizing district.  Moreover, the government cannot argue that it did not know this to be true, as an amendment to Rule 41(b) was proposed by the government, as early as 2014, later adopted as Rule 41(b)(6), to permit a magistrate judge to authorize searches such as the NIT. See Reena Raggi, *Report of the Advisory Committee on Criminal Rules*, May 5, 2014, at 319.6.

*In re Warrant*, further supports the recognition that the government was aware that Rule 41, as it existed at that time, did not support the NIT. In that case, the court stated that where the location of the Target Computer is unknown, "the Government's application cannot satisfy the territorial limits of Rule 41(b)(1) ." 958 F. Supp. 2d at 757. It is unlikely that the Government was unaware of this opinion when it filed its application.

As there was a clear and unexcused violation of Rule 41 and 28 U.SC. 636, as well as the Fourth Amendment, suppression should be granted.

## B. THE LABELLE WARRANT WAS NOT SUPPORTED BY PROBABLE CAUSE AND THE "GOOD FAITH" EXCEPTION DOES NOT APPLY

The evidence should also be suppressed because the Labelle Warrant was not supported by probable cause. The test for determining probable cause is whether the facts presented to a judicial officer establish a "substantial probability" that the items sought will be found at the target location. *Illinois v. Gates*, 462 U.S. 213 (1983). The determination of probable cause calls for a "practical commonsense" inquiry. *Id.* at 238. Probable cause is determined under a "totality of the circumstances" analysis. A judicial officer who is considering an application for a search warrant must decide "whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Id.*

The fact that an individual has accessed a website containing child pornography does not, by itself, provide sufficient probable cause for the issuance of a search warrant. For example, in *United States v. Falso*, 544 F.3d 110, 121 (2d Cir. 2008) there was no allegation that the defendant subscribed to a child pornography website,  only that it "appear[ed]" that he "gained access or attempted to gain access" to the non-member cpfreedom.com website. In finding no probable cause, the court stated "[e]ven if one assumes (or infers) that Falso accessed the [site], there is no specific allegation that Falso accessed, viewed or downloaded child pornography." *Id.* *See also  United States v. Doan*, 245 F. App'x 550, 2007 WL 2247657. * 3 (7th Cir. 2007) (finding the search warrant affidavit to be stale where the defendant purchased

14

memberships to child pornographic web sites seventeen months earlier, but the affidavit did not set forth the duration of the subscriptions, the last date that the defendant accessed the web site, or any information with respect to downloading); *United States v. Strausser*, 247 F. Supp. 2d 1135 (ED Mo, 2003) (stripped of false information that defendant received e-mails from the site, mere fact that the defendant subscribed to web site on which child pornography was posted did not state probable cause). (compare *United States v. Schwinn*, 376 F. App'x 974 (11th Cir. 2010)(probable cause for a search warrant existed where the defendant has subscribed to four child pornography websites and was a registered sex offender).

The affidavit in support of the Labelle Warrant were insufficient for a finding of probable cause to believe that child pornography would be found at Mr. Nobles' residence.  Judge McCoy was advised that "FizzWink 222 had registered an account on January 27, 2015 and had been actively logged in for a total of 17 hours between January 27, 2015, and March 5, 2015. Judge McCoy was further advised that on February 28, 2015, someone using the user name "FizzWink222" accessed the Government's server, and that the Government was successful in capturing the IP address which was associated with "FizzWink222." The affidavit merely alleged that "FizzWink222" accessed a post entitled  "Brainwashed Hardcore Smurfette 1," which was located in the ">>Pre-teen Photos >> Girls HC >> Brainwashed Hardcore Smurfette 1 section of the website." According to the affidavit, this post contained a link to a file and a password to preview an image/video. However, no further information was provided to the court. The affidavit never advised that any illegal

material was viewed or downloaded on that occasion, or that the link in question was actually accessed.

Thereafter, the Government was able to determine someone using the user name "FizzWink222" again accessed the government server on March 1, 2015. However, the affidavit conceded that the user's IP address was not collected on this occasion. The affidavit again alleged that on that date user "FizzWink222" accessed a post that contained a link to an image that depicted a pre-pubescent female being anally penetrated by an adult male. Similarly, there was no allegation provided indicating that the image on the post in question was actually viewed, much less that any illegal material was downloaded on this occasion either.

On the third occasion, March 3, 2015, the affidavit alleged that the user "FizzWink222" accessed a post which contained a link to an image that depicted a pre-pubescent infant female with an adult male penis pressed up against her vagina. As before, the affidavit makes clear that there was no IP address information collected on this occasion. Also as before, there is no indication the image referred to was actually viewed or the link to the image accessed. Again, there was there any indication that any illegal material was downloaded or viewed on that occasion also.

Moreover, according to the affidavit for the Labelle Warrant, Website A included forums which contained child pornography, and forums which did not contain child pornography. Exhibit B ¶ 19.

There was no indication in the affidavit that the government had identified the person or persons linked to "FizzWink222." The warrant simply identified the suspect as "a user of the internet account at 745B F Road, Labelle, Florida 33935." Exhibit B ¶ 6.  Therefore, no information was provided as to Mr. Nobles.

Since there was no allegation that "FizzWink222" accessed the government's server from the same IP address on March 1 or March 5, 2015 as had been used on February 28, the affidavit relied on a single access to the government's server.

On this record there is no support present for any nexus with regard to the address for which the Labelle Warrant was sought and any likelihood that those items listed in the search warrant would be found in that particular location.

When an affidavit is lacking in probable cause, evidence seized pursuant to the warrant may be admitted only where the "affidavit was made in good faith, the warrant was issued by a detached and neutral magistrate and the warrant was reasonably relied on in good faith by the police officers." *United States v. Richardson*, 861 F.2d 291, 294 (D.C. Cir 1988) (citing *Leon*, 468 U.S. 897). Here, the government cannot find safe harbor in the *Leon* exception with respect to this issue either. The Labelle Warrant hinged on an affidavit that was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See United States v. Edelen*, 529 A.2d 774, 786 (D.C. 1987). The affiant could not possibly have been unaware of the absence of any meaningful connection between the Labelle residence and the warrant they sought. Any reliance by the officer could not be in "good faith."

17

For the reasons stated above, all physical evidence recovered as a result of the execution of the Labelle Warrant should be suppressed from use at trial.

## A.  MR. NOBLES WAS INTERROGATED IN VIOLATION OF MIRANDA

Nothing is more basic than the legal requirement of the reading of rights pursuant to *Miranda* prior to a custodial interrogation. See *United States v. Hall,* 493 F.2d 904, 905 (5th Cir. 1974). "It is now undisputed that the right to *Miranda* warnings attaches when custodial interrogation begins." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (citing *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004)).

The determination as to whether a defendant is "in custody," so as to mandate Miranda warnings before questioning, is objective and is made based upon the totality of the circumstances. *See Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529 (1994); *California v. Beheler,* 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983). Custody simply means that there is a deprivation of "freedom of action in any significant way." *Miranda,* 344 U.S. at 444. There is no requirement of a formal arrest or that the procedure takes place at a police facility. *See United States v. Kim*, 292 F.3d 969, 977-978 (9th Cir. 2002) (holding that the defendant was in custody when questioned during the search of her store because she was in an intimidating atmosphere and kept away from her husband). "A defendant is in custody for the purposes of Miranda when there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Brown,* 441 F.3d at 1347 (citing *Beheler,* 463 U.S. at 1125). The Supreme Court has explained that the

objective determination involves two discrete issues: (1) what were the circumstances surrounding the interrogation; and (2) given those circumstances, would a reasonable person have felt free to terminate the interrogation and leave. *J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2397 (2011).

The interrogation of Mr. Nobles in the back room of his house was clearly "custodial." Mr. Nobles' resides with his elderly parents in a home sitting on approximately five acres in a rural area in Hendry County, near Labelle. At approximately 6 a.m., Mr. Nobles and his father were awaken by a loud banging on the front door.  Mr. Nobles, dressed only in sweat pants, answered the door. Upon opening the door, Mr. Nobles encountered at a minimum three uniformed Hendry County Sheriff's Deputies plus an additional plain clothes officer, believed to be an FBI agent.

Mr. Nobles and his father were detained, instructed to exit the residence, and to remain on the porch.  Several police vehicles, some marked and some unmarked, were visible in the driveway. At least two additional uniformed deputies were positioned in the front yard. Several FBI agents were standing in the driveway near the police vehicles. These agents were dressed raid gear. Some of the agents wore side-arms.

After Mr. Nobles and his father were moved to the porch, the FBI agents entered the residence, leaving Mr. Nobles in custody of the deputies who remained on the porch. A deputy was positioned between Mr. Nobles and the ramp which was

the only means to exit the porch. The deputies remained with Mr. Nobles and his father for approximately a period of time.(estimated to be 10-15 minutes)

After this time, one of the FBI agents came out. Mr. Nobles' father was first escorted into the house followed by Mr. Nobles. Both were seated in a room inside the residence. Approximately 3-4 agents were in the same room, working from the breakfast bar.

After a short time, the agents took his father to a back room in an addition to the residence, behind the laundry room. After a short time, the agents brought Mr. Nobles' father back into the main part of the house. In order to interrogate him, the agents then moved Mr. Nobles back to the same back room where his father had been questioned. Two agents, Kevin Bunch and Zac Ewart, placed Mr. Nobles in a chair in the room and positioned themselves in chairs directly in front of him. Mr. Nobles called his employer indicating he could not come to work that day.

Agents Bunch and Ewert then engaged in a custodial interrogation of Mr. Nobles in violation of *Miranda*. While the agents gratuitously made a statement to the effect that Mr. Nobles did not have to speak to them, no reasonable person under the circumstances would perceive that they were free to leave.

Nor can there be any doubt that an interrogation occurred. The Miranda safeguards apply "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-301, 100 S. Ct. 1682, 1689 (1980). The 'interrogation' inquiry "refers not only to express questioning, but also to any words or actions on the part of the police (other

20

than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. The primary focus in determining whether an incriminating response was reasonably likely to be elicited from the suspect is on the perceptions of the suspect, rather than on the intent of the police."

With regards to the issue of whether the conversation was an "interrogation", Mr. Nobles was simultaneously barraged for approximately an hour and a half with questions that the agents knew were "reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 301. For example, Mr. Nobles was questioned to establish his computer use, internet access, passwords, and computers on location, as well as access to those computers. He was questioned regarding the use of the Tor network, access to child pornography, and methods of downloads. Mr. Nobles was also asked personal questions regarding sexual orientation and habits. All of this interrogation was for the purpose of eliciting incriminating responses to ensure that Mr. Nobles would be convicted of this offense. At no time was he told that he had the right to counsel, and that he had the right to confer with an attorney prior to answering any of the questions during the interrogation. *See Innis*, 446 U.S. at 301. As a result, Bunch and Ewert engaged in an interrogation of Mr. Nobles, as defined in *Innis. Id.*

Under the circumstances, all un-Mirandized statements and any fruits of un-Mirandized statements should be suppressed.

WHEREFORE, the defendant moves that the Court suppress all evidence obtained as a result of the search and seizure authorized by the NIT search warrant, the Government's illegal search of Mr. Nobles' residence pursuant to the Labelle Warrant, and the Government's illegal questioning of Mr. Nobles after serving the Labelle Warrant.

Respectfully submitted,

DONNA LEE ELM

Federal Defender

By: /s/ Russell K. Rosenthal
Russell K. Rosenthal
Assistant Federal Defender
FL Bar ID No. 0319244
1514 Broadway, Suite 301
Fort Myers, Florida 33901
Telephone: (239) 334-0397
Fax: (239) 334-4109
Counsel for William Nobles

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of September, 2018, the foregoing was electronically filed with the Clerk of Court, and a copy will be sent electronically to Yolande Viacava, Assistant United States Attorney, 2110 First Street, Fort Myers, Florida 33901.

/s/ Russell K. Rosenthal